1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


RAYONIER ADVANCED MATERIALS,           )
INC., RAYONIER PERFORMANCE             )
FIBERS, LLC,                           )
                                       )
            Plaintiffs,                )        CASE NO.
                                       )   2:21-CV-00063-LGW-BWC
        vs.                            )
                                       )
JOSHUA BYERLY,                         )
                                       )
_____Defendant.             )


                    MOTION HEARING
        BEFORE THE HONORABLE LISA GODBEY WOOD
            June 29, 2021; 10:35 a.m.
                 Brunswick, Georgia
APPEARANCES:

For the Plaintffs:          JAMES B. DURHAM, Esq.
                            MATTHEW BALCER, Esq.
                            Hall Booth Smith, P.C.
                            3528 Darien Highway
                            Suite 300
                            Brunswick, Georgia  31523
                            (912)554-0093
                            jdurham@hallboothsmith.com
                            mbalcer@hallboothsmith.com


For the Defendant:          Pro Se


Reported by:                Debbie Gilbert, RPR, CCR
                            Official Court Reporter
                            801 Gloucester Street
                            Post Office Box 1894
                            Brunswick, GA 31521-1894
                            (912) 262-2608 or (912) 266-6006
                            debra_gilbert@gas.uscourts.gov


                        - - -

2

1              P R O C E E D I N G S

2           (Call to order at 10:35 a.m.)

3        THE COURT:  Good morning.

4        SPEAKERS:  Good morning.

5        THE COURT:  Ms. Sharp, call the next case.

6        THE CLERK:  Rayonier Advanced Materials, Incorporated,

7  Rayonier Performance Fibers, LLC versus Joshua Byerly.  James

8  Durham and Matthew Balser for the plaintiff.  Mr. Byerly is

9  present pro se.

10        THE COURT:  Gentlemen and lady, we are here on the

11  Plaintiff Rayonier's application for a temporary restraining

12  order pursuant to Rule 65.

13        Looking at the docket, I notice that Rayonier has

14  provided a verified complaint.  They have obviously alerted Mr.

15  Byerly to the filing of this motion and I note his presence.

16        The complaint sets forth adequately an allegation of

17  subject matter jurisdiction under the federal Defend Trade

18  Secrets Act and personal jurisdiction in that it alleges that

19  Mr. Byerly lives in Long County, which is within the Southern

20  District of Georgia in the Brunswick Division.

21        With that, Mr. Durham, let me call on you as the movant

22  to come forward and walk me through Rule 65 and the four

23  requirements for the issuance of a TRO.

24        MR. DURHAM:  Yes, Your Honor.  Thank you.

25        And Your Honor, so you know, also present in the

1   courtroom with me today is Whitney McGuire, who is assistant

2   general counsel for Rayonier Advanced Materials, as well as Jim

3   Henderson, who the pulp mill manager in Jesup.

4        THE COURT:  All right.

5        MR. DURHAM:  Your Honor, you've obviously stated the

6   basis of what we are here under the DTSA as well as under the

7   NDA that he has executed, and, of course, the grounds for

8   granting a temporary restraining order are that you have to

9   prove that there is a substantial likelihood of success, that

10  there is the potential for irreparable harm, that the harm to

11  the plaintiff would far outweigh any harm to the defendant and

12  that it will not disservice the public.  And we believe that we

13  have all the grounds to be able to do that.

14       Just briefly, as general background for The Court,

15  Rayonier Advanced Materials -- as The Court is familiar with the

16  longstanding tradition of Rayonier in this community -- produces

17  pulp, fluff pulp but also dissolving pulp, and what Rayonier

18  Advanced Materials is best known for is they are one of the

19  leaders in the world in dissolving pulp.  It's a much smaller

20  market.  It's not the fluff pulp market that is basically a

21  commodity, and over the years, Rayonier Advanced Materials has

22  developed their products through protected trade secret

23  information.

24       What essentially they do is they are able to take pulp

25  and produce it to certain grades that certain clients need that

4

1    they take and then they dissolve it down into their product, so

2    it takes a very pure product and something that Rayonier does

3    and does it with specification as to each particular customer.

4         THE COURT:  Just out of curiosity, I'm having trouble

5    imagining the usage that customers put it to.  Give me a --

6         MR. DURHAM:  It goes into medicine.  It goes into LCD

7    screens.  It goes into computers.  It goes into cell phones.  It

8    goes into any type of filter-type products, so there are a lot

9    of products that it goes into, and, like I said, it is a smaller

10   market, but Rayonier Advanced Materials has been the leader in

11   that market for years and years, and they are the leader in that

12   market, not because they have the biggest mill, not because they

13   have the fanciest equipment, not because of anything else, but

14   it's because of their protected trade secret information, the

15   intellectual property that they have and essentially, for lack

16   of a better term, the cooking formulas that they use.

17        Mr. Byerly was hired in 2014.  He signed an NDA at that

18   time, which is attached as Exhibit A to the complaint, and what

19   this particular -- he was the area manager and he's an engineer

20   in what is referred to as the SVP chemical preparation area.

21        This is basically the chlorine dioxide part of the plant

22   where all of the bleaching takes place and this is where the

23   most protected part of our trade secrets exist.  It's in the

24   bleaching process, and essentially, as I mentioned, basically

25   it's the cooking formulas that we use for the various products,

5

1    so he is intimately familiar with this process.

2          He's worked there since 2014.  He understands these

3    particular cooking formulas and he understands by what he signed

4    and through the various years the trade secrets that exist

5    there.

6          I think you will also see in the complaint that we make

7    clear Rayonier goes to great extremes to protect this material.

8    I think it's in Paragraph 23 of the complaint.  In fact, we go

9    through some detail on the various things we do to try to

10   protect our trade secrets and have for years.

11         Rayonier obviously, too, obtains great economic value

12   from the protection of these trade secrets and this information

13   that we're able to use and to put into our product.

14         So that's sort of the base, the background, the

15   information.  And Rayonier, Ray-AM -- and I apologize, sometimes

16   I say Rayonier.  They split in 2014 and actually the other

17   entity took the name Rayonier.

18         THE COURT:  Let me ask you about that.  When they did

19   split, the non-disclosure agreement that Mr. Byerly signed, did

20   it travel over?

21         MR. DURHAM:  To Ray-AM, which is essentially, Your

22   Honor, the parent company, so it went to Rayonier Advanced

23   Materials.

24         THE COURT:  And what was the mechanism when the parent

25   company became the parent company?

6

1        MR. DURHAM:  They retained all contracts that had been

2   originally in the name of Rayonier, Inc.  Rayonier, Inc. was

3   essentially the REIT portion of the business and the timber

4   portion.  So they took all timber.

5        Everything to do with the mills remained with Rayonier

6   Advanced Materials.  Contracts, et cetera, employees, that all

7   went to Rayonier Advanced Materials.

8        Rayonier Performance Fibers is an LLC, but it also has

9   technical ownership of the mills, and there are various

10  subsidiary entities, and a lot of that is done for various

11  reasons, business reasons for the company, but Rayonier

12  Performance Fibers and then Rayonier Advanced Materials are the

13  two entities that will be involved in this.

14        THE COURT:  All right.

15        MR. DURHAM:  Your Honor, this basically comes down to

16  the situation in which Mr. Byerly had been working for Rayonier

17  Advanced Materials since 2014.  There had been a couple of

18  issues that had occurred, one in a shutdown in July, June of

19  2020, where there are some issues that came up, and people were

20  a little concerned about some things that may have been said.

21        Then in November/December of 2020 he --

22        THE COURT:  The wellness check.

23        MR. DURHAM:  The wellness check took place, and then in

24  this last shutdown that started at the end of April of 2021,

25  there were some other issues that came up.  I think Mr. Byerly

7

1   at some point made some comments about gas or being exposed to

2   gas or some other issues that may have taken place,

3   understanding, of course, that during a shutdown, really there's

4   not a whole lot of gas materials going on.

5          That's not to say that he wasn't exposed to some or

6   smelled some type of material as a result of the shutdown and

7   some of the contractors coming in and whether there was any

8   other type of fiberglass or other kind of materials that were

9   around, but the bottom line is there were some issues that came

10  up, and on approximately May 25th of this year, they suggested

11  that he go home, that there be just a temporary suspension,

12  leave, and then what then later occurred was on approximately

13  June 3rd, based upon their concern with some of the behavior

14  that had occurred, that there was a termination at will that was

15  taking place.

16         There was the proposed severance package and settlement

17  agreement that was discussed and that there was going to be a

18  payment at that time, a severance payment, of 25,000.00.

19         On the last day of acceptance of the severance package

20  he had called Ray-AM and said he wouldn't take the 25,000.00,

21  but would take two million.  Then shortly thereafter, too, there

22  had been some e-mails that had gone back and forth to some

23  employees at the mill.  Some of the e-mails were shut down as a

24  result of a lot of e-mails, and there was a little concern,

25  people just uneasy as a result of it, and ultimately there was

8

1  that e-mail that is attached as Exhibit B, and you will see it

2  was actually sent to another engineer in the plant, but it was

3  addressed to a lot of the corporate leadership, the CEO, Paul

4  Boynton, Bill Manzer, who is one of the senior vice president in

5  charge of all operations.  Mr. Henderson himself was on the

6  e-mail.  The mill manager was on the e-mail.

7       And in that e-mail, it essentially states -- and just to

8  paraphrase -- that, you know, "You could suffer -- this is the

9  last card in my arsenal."

10      THE COURT:  "Irreparable harm."

11      MR. DURHAM:  "Irreparable harm to ten million to" -- no,

12  "100 million," I believe, "to ten billion dollars," and that

13  then in the last part of it, it talks about he had

14  reverse-engineered the entire SVP plant.

15      Now, understanding when we're talking about the SVP

16  plant, that is not a product.  That is where we produce things

17  and where our very essential trade secret information,

18  confidential information, exists, and obviously it causes my

19  client extreme concern.

20      The biggest part and why we are here -- and I want to be

21  clear about this and the client wants to be clear about this --

22  we're not here to hurt Mr. Byerly in any way.  We're not here

23  looking for millions of dollars or anything else.

24      What we're here for solely is to protect our trade

25  secrets, to protect our business confidential information and

9

1    proprietary information, not only under the Trade Secrets Act

2    but under the NDA.  I mean, he has a responsibility not to

3    disclose that information.  He realized that we could go into

4    court to get injunctive relief under Paragraph 5 of the NDA.  He

5    understands under 1(a) and 1(b) of the NDA the confidential and

6    the trade secret information that exists, 1(d) that he has a

7    responsibility to return any type of information that belongs to

8    Ray-AM and to the company in any form, including any copies of

9    it.

10        I know there's a comment in there about SpaceX and I'm

11   not exactly sure where all that fits in, but if there is any

12   type of intellectual property that's being used from Ray-AM for

13   any purpose, it's supposed to come back to Ray-AM, and like many

14   NDA's that I'm sure The Court has seen over time with

15   companies -- I know the University of Georgia had it for anybody

16   that's an employee of the University of Georgia -- anything

17   that's invented or anything else using the process or the

18   facilities of a company the NDA says belongs to that company.

19        Now, we have no interest in a spaceship, but what we do

20   have an interest in is protecting our trade secrets, and so what

21   we're asking The Court to do as a result of that is enter an

22   order that will not allow him to disclose any trade secrets of

23   Rayonier Advanced Materials, the plaintiffs in this case, to

24   make sure that he does not misappropriate any of the trade

25   secrets that he may have in his possession or in his head, that

1    also there is indication that there was a thumb drive where two

2    files were downloaded.

3         We're not completely clear on all of the information

4    that is on those two files, but it was characterized as "SVP"

5    and I believe also "chlorine generator," and it has the

6    potential to clearly have information that could be trade

7    secrets, but irrespective of that, it's my client's property and

8    he's not supposed to have that.

9         Now he has had some communication, I know, with Ms.

10   McGuire.  He had indicated that all the thumb drives and

11   everything he had were left on his desk.  I know that our IT

12   department has looked at what was there and it does not match up

13   as to what we understood was downloaded on the thumb drive that

14   we have mentioned in the verified complaint.

15        So basically we just want in addition our material

16   returned to us.

17        THE COURT:  Thank you, Mr. Durham.

18        Let me hear from you, Mr. Byerly, if you will come to

19   the podium.  This is your opportunity to make any argument that

20   you would like or to present any information that you would like

21   The Court to consider.

22        MR. BYERLY:  Certainly, Your Honor, and I will apologize

23   in advance.  I did not have time to get a lawyer due to the

24   expedited nature of this hearing.  I had to travel 1700 miles

25   from where I was currently in Colorado, and, you know, I made it

1    here, so I apologize in advance for any unintentional rudeness,

2    for my lack of understanding of court policy, so first off may I

3    present Your Honor with three e-mail chains that I would ask

4    Your Honor to read?

5         THE COURT:  You may if you will first present it to the

6    other side so that they can look at what it is that I'm looking

7    at, and then I will take a look at it.

8         MR. BYERLY:  Very well, I will let them.  The middle one

9    is the full e-mail of which you have only the last one.  The

10   earlier pieces are incredibly important as I believe Rayonier

11   has no case whatsoever against me.  My --

12        THE COURT:  Wait, just to be clear, sir, so you're

13   referring to what Rayonier provided in Exhibit B?

14        MR. BYERLY:  I believe it was Exhibit B.  I would have

15   to pull up my copy.

16        THE COURT:  They gave me your Monday, June 14th, 2021

17   12:05 p.m. e-mail to a number of different addresses so what you

18   have is the e-mails around it; is that right?

19        MR. BYERLY:  Correct.  You said you have the June 14th

20   e-mail?

21        THE COURT:  I do, the 12:05.

22        MR. BYERLY:  The one you really need to see is the

23   initial one I sent on June 4th.

24        THE COURT:  Okay.

25        MR. BYERLY:  That's the one that -- as well as the

12

1   documentation of where this all started.  The short version, to

2   kind of open my case, is that this is all a safety issue.

3        THE COURT:  And, Mr. Durham, if you will pass that up.

4   Let me take a look.

5        MR. BYERLY:  May I now?

6        THE COURT:  Yes, Mr. Byerly.  Perhaps it will be better

7   if I read this before you continue so we can stay on the same

8   page.

9        MR. BYERLY:  That would make it a lot easier.

10        THE COURT:  And let me, I know you're here on your own

11   accord, but Ms. Gilbert is going to write down every single

12   thing we say in court so it's very important you not talk over

13   anyone; understand?

14        MR. BYERLY:  Yes, ma'am.

15        THE COURT:  She's good, but she's not that good.  No one

16   is.

17        Mr. Byerly, if you will resume.  I did have the

18   opportunity to read these and we will mark these three as a

19   Composite Defendant's 1.  Ms. Sharp, if you will do that.

20        Continue.

21        MR. BYERLY:  So the issue at hand and the root cause

22   where all this started from is a safety issue.  It's not a -- I

23   in no way intend to, in any form, to use for my or any other

24   third party's benefit or even for Rayonier's harm any of the

25   intellectual property with which I am aware of.

1     However, I would also state that the property they

2  reference largely does not exist.  I am aware of information

3  regarding things that they do consider to be trade secret simply

4  because I indirectly came into contact with those things and

5  consequently will keep that information solely to myself for no

6  one's benefit.

7     The references they make to the SVP being trade secrets

8  are completely -- well, I will just put it like this.  If there

9  is any trade secret to be had there, it's only there because I

10  created it, and so it would be -- if they own it because I

11  created it, that's fine, and I will not use any such things for

12  my benefit either; however, the SVP plant is designed by a

13  company currently known as Nouryon.  I would have to look it up

14  to spell it again.  I don't remember if they changed names here

15  several times in the last few years, and so any intellectual

16  property most likely belongs to them rather than Rayonier

17  Advanced Materials, and I have also communicated to all of my,

18  you know, quote/unquote, reverse engineering, it's really just

19  my gaining an understanding beyond the original understanding of

20  the designers of the plant.

21     I spent enough time, I had enough opportunity and enough

22  motivation for the benefit of Rayonier Advanced Materials to

23  investigate as deeply as I possibly could the inner workings of

24  that plant so that we didn't have what are known as decomps.

25  That's what happens when the reaction takes off exponentially

14

1    and actually causes an explosion effectively inside the vessel.

2         Back in 2017 and 2018, we had a rash of I think it was

3    over 200 decomps, if I recall correctly.  We almost created that

4    situation again, and the only reason we avoided it is because of

5    my extensive knowledge, which I used expressly for Rayonier's,

6    Ray-AM's benefit.

7         So I have only ever used the knowledge and details

8    regarding the SVP for my employer per my agreement in accordance

9    with the NDA.

10        So let me catch my thought here for a minute.  Sorry.

11        Regarding the safety issues, which is really what

12   started all this and ultimately resulted in my what I believe to

13   be unlawful termination, was a -- it started off, it's been

14   growing for several years, but it was -- it was so subtle, you

15   know, that it was difficult to detect, and I couldn't really put

16   my finger on exactly what it was.  I just had a gut feeling that

17   it wasn't right, that we were moving in the wrong direction.

18        Things continued to escalate and eventually I managed to

19   wrap my mind around what the wrong direction was and that

20   direction was that we were taking action to mitigate safety

21   hazards that were so minor that the mitigation actually created

22   a bigger hazard than the original concern in the first place,

23   and they have been doing this now for several years, and they do

24   it with the best of intentions.  I don't believe it's malicious.

25   I don't think -- I think they just don't realize it.  For

1    example, if you have a risk of one in 10,000 of getting injured

2    in a random day in the plant -- that's an arbitrary number but I

3    think it's probably in the right ballpark -- and you increase

4    the risk to one out of 8,000, that's not a good move.  I mean,

5    it might be done with good intentions, and I expressed my

6    concerns somewhat generically in that first e-mail train last

7    year and that was following the twice-a-year shutdown.

8           Every year we have an annual outage where, for a period

9    of a few weeks, we take the entire plant down for maintenance

10   work.  It's by far the busiest and the most dangerous time of

11   the year every year, and so that's when any safety issues that

12   are present come to a head and become -- have a potential for

13   serious harm.

14          The year -- last year, when I wrote that e-mail, I

15   had -- it was my first shutdown in operations, so I had

16   previously been in the engineering department where I designed

17   equipment and installed and, you know, worked with maintenance

18   to help them maintain it.

19          That last year was the first time I actually managed the

20   equipment that I had helped install, and so I was -- I had

21   operators who reported to me.  I had a lot higher degree of

22   responsibility than I had had in previous years, and it was very

23   eye-opening because I suddenly saw all of the things that had

24   been building in the back of my mind in full update, so to

25   speak.

1          And so I made -- I expressed my concerns which were

2     quite lengthy.  I had plans to detail them in numerous

3     subsequent entries documenting and bringing it to the attention

4     of the levels of management and I started with the local

5     management, which was, I felt, the appropriate action.  I had

6     previously expressed concerns to both my boss and his boss, who

7     is Jim Henderson, by the way, present today in this courtroom,

8     and they understood my concerns but they had no power to take

9     action on them.

10         They were -- they were basically held and prevented from

11    in any way following my recommendations by upper levels, which

12    is why I escalated things by submitting a entry into our safety

13    system, because Rayonier Advanced Materials is a company that

14    claims to pride itself on safety.  They claim that it's the

15    Number 1 priority, and, frankly, what I have seen in the last

16    few years does not indicate that to me, and what I've seen in

17    the last few weeks is appalling.

18         So last year I expressed my concerns.  Initially there

19    was a big reaction.  You know, Garrett Lewis, my direct

20    supervisor, and Jim Henderson, who is in the courtroom, met with

21    me to discuss my concerns.  They took a nice long list.  I

22    thought they -- you know, well, let me rephrase that

23    differently.

24         I know they took my concerns seriously, but, once again,

25    management stopped them from executing any of my concerns.

1          Last year, I was exposed to chlorine dioxide gas.  I was

2     there when -- I was told to tighten packing.  We have

3     centrifugal pumps that are what we use to move the chlorine

4     dioxide throughout the plant, and either those pumps --

5     obviously, there's a shaft on that pump, and it spins.  There is

6     no way to perfectly prevent leakage, so you're going to have

7     something leak by that shaft.

8          Rather than letting chlorine dioxide that is a very

9     toxic hazardous chemical out, you put water in so that water

10    leaks out and also leaks into the process.

11         In other words, you're always dripping water but you're

12    not dripping chlorine dioxide.  So it's a very effective means

13    generally.

14         Both last year and this year, the sort of annual outage

15    was split up.  We have three different lines in the mill and

16    three different -- you know, they can be run somewhat

17    independently.  That's debatable, but anyways, we ran one of

18    them while two of them shut down, which meant we had most of the

19    chlorine dioxide pumps down; however, there were two that were

20    still running in a very upset, unstable condition because the

21    utilities department is used to supplying all three lines.

22         We rarely -- every once in a while -- will take down one

23    line for a down day of work.  But that's for one day.  This was

24    weeks -- well, a week, I guess, a week-plus whenever they took

25    down, you know, all the mills except C mill, which meant that,

1   you know, the water supply system that protects these pumps was

2   not in a normal state.

3        Last year, I expressed concern that tightening the

4   packing was not the right thing to do after we tried it multiple

5   times and it made it worse.  Every single time we leaked more

6   chlorine dioxide when we tightened the packing rather than less,

7   and so this year when I was asked to tighten the packing again,

8   I said, "Please don't make me do that; it's not the right thing

9   to do; it will make it worse."  I had no idea how much worse.

10       Eventually I was forced to tighten the packing, and you

11  can read the description of the events on that June 4th e-mail,

12  which, by the way, Rayonier did not ask me to provide prior to

13  my termination.

14       I believe there are OSHA and possible criminal

15  litigations that will potentially follow from that.  I'm, by the

16  way, currently an OSHA whistleblower.  I have made the report to

17  OSHA.  I have not heard yet from the representatives.  I'm not

18  sure what's taking them so long.

19       I will probably call them again to see how they are

20  doing, and because this, this last year, when we tightened the

21  packing, it actually backed chlorine dioxide into the piping

22  that is water piping.  I only happened to find it because I was

23  doing an audit on a lockout, which is the means we use to safely

24  prepare equipment for work.  It's where you hang locks on all

25  applicable valves, breakers, anything that could potentially

1    have energy in it to make equipment safe to work on.

2         I was verifying that per my job.  I actually looked at

3    the wrong valve but thought, you know, it was a water valve.  I

4    knew it should have been safe to open that valve; however, it

5    was not.  When I opened the water valve, pure chlorine dioxide

6    solution came out.  It would cure in that pipe at 11 grams

7    per liter.  Normally chlorine dioxide is stored in chill water.

8    It's done because you cannot actually dissolve chlorine dioxide.

9    It will always be a gas; but, if you keep it in chill water, it

10   will very, very slowly escape through the water.

11        If you have it in warm water, it will escape instantly.

12   This is what happened.  I was exposed to what I would estimate

13   to be ten, at least ten parts per million chlorine dioxide gas.

14   The immediately-dangerous-to-life-and-death threshold I believe

15   is one part per million, and there have been recorded instances

16   where 19 parts per million was fatal.

17        So I literally almost died this shutdown.

18        THE COURT:  I hear what you're saying is that you have

19   what you believe are very sincere --

20        THE WITNESS:  Very serious.

21        THE COURT:  -- and serious safety concerns.

22        MR. BYERLY:  Correct.

23        THE COURT:  What I don't hear is how that allows you to

24   break the confidentiality, the non-disclosure agreement.

25        MR. BYERLY:  I'm confused.  I'm not breaking the

20

```
1    non-disclosure agreement.
2             THE COURT:  So you don't have any --
3             MR. BYERLY:  No.
4             THE COURT:  -- intellectual property?
5             MR. BYERLY:  Nothing except what's in my mind, and I
6    obviously cannot erase that.  But I can choose not to use it.
7             THE COURT:  Excuse me.  Just to be clear, you have not
8    downloaded any information --
9             MR. BYERLY:  The flash drives are where they were at.
10            THE COURT:  Wait.  I'm going to ask you one more time --
11            MR. BYERLY:  Sure.
12            THE COURT:  -- wait until I finish.  Okay?
13            MR. BYERLY:  My apologies.
14            THE COURT:  So my question is:  You have not downloaded
15   any intellectual property on a thumb drive or any kind of device
16   that will allow you to take what Rayonier is classifying as
17   intellectual property --
18            MR. BYERLY:  Uh-huh.
19            THE COURT:  -- or any kind of protected information?
20   You have not downloaded anything?
21            MR. BYERLY:  Well, I did download it onto two -- well,
22   one flash drive which Rayonier has.  It's in their possession.
23   I never took that flash drive out of the office.
24            THE COURT:  All right.
25            MR. BYERLY:  It's still there wherever they are
```

1   currently storing it.  The second flash drive --

2        THE COURT:  Wait just one second.  I'm sorry.  As you

3   stand before me now, you have never taken away from Rayonier,

4   other than in your mind --

5        MR. BYERLY:  Uh-huh.

6        THE COURT:  -- any form of flash drive, anything that

7   has their information on it?

8        MR. BYERLY:  To the best of my knowledge.

9        THE COURT:  All right.  Well, you would be the one to

10  know.

11       MR. BYERLY:  I would certainly hope that I'm the one to

12  know.

13       THE COURT:  Have you already disclosed anything in your

14  own head or in any other form to any third party other than

15  Rayonier?

16       MR. BYERLY:  Not since my termination.

17       THE COURT:  Prior to your termination, you have?

18       MR. BYERLY:  As I've mentioned, the owner of the SVP

19  plant technology is Nouryon.  Their representative, Barry

20  Billet, and I have had numerous conversations while employed by

21  Rayonier for Rayonier's benefit.

22       THE COURT:  After your termination, you have not?

23       MR. BYERLY:  No.

24       THE COURT:  Is it your intention to violate your

25  non-disclosure agreement in any way?

22

1        MR. BYERLY:  Not at all.

2        THE COURT:  Can you articulate for me what would be the

3   harm to you if I were to enjoin you from doing something you say

4   you don't want to do?

5        MR. BYERLY:  I'm not aware of the legal ramifications of

6   having that on my record.  That would be the only potential harm

7   but I'm not aware of any other harm.

8        THE COURT:  You're obviously a very intelligent person,

9   and one thing I want you to take away from this hearing --

10        MR. BYERLY:  Uh-huh.

11        THE COURT:  -- more than anything else --

12        MR. BYERLY:  Sure.

13        THE COURT:  -- is when The Court issues an order --

14        MR. BYERLY:  Yes.

15        THE COURT:  -- it is, of course, binding on you.

16        MR. BYERLY:  Understood.

17        THE COURT:  I understand that, on the one hand, you have

18   serious heartfelt safety concerns.

19        MR. BYERLY:  Uh-huh.

20        THE COURT:  What we're here about, though --

21        MR. BYERLY:  Right.

22        THE COURT:  -- is actually a separate matter.

23        MR. BYERLY:  Okay.

24        THE COURT:  And it's that non-disclosure agreement.

25        MR. BYERLY:  Sure.

23

1          THE COURT:  If you do want to follow up about safety

2    concerns --

3          MR. BYERLY:  Uh-huh.

4          THE COURT:  -- you have legal avenues to do so.

5          MR. BYERLY:  Correct.

6          THE COURT:  One of which is decidedly not violating a

7    non-disclosure.

8          MR. BYERLY:  Absolutely.

9          THE COURT:  Understand?

10          MR. BYERLY:  Absolutely.

11          THE COURT:  I have concern that -- and I did read all

12    the e-mails that you submitted.  You seem to equate, to put it

13    in a base way, give me ten million dollars or I will disclose

14    this.

15          MR. BYERLY:  No, ma'am.  Let me explain that further.

16    The only references for the dollar amounts that I made were

17    merely to get attention because I was not getting attention

18    otherwise.

19          THE COURT:  I understand.

20          MR. BYERLY:  I apologize that I'm basically wasting your

21    time this morning.

22          THE COURT:  You're not wasting my time.  It's a serious

23    dispute.

24          MR. BYERLY:  It is a serious dispute, and I'm very sad

25    that it came to this because --

24

1          THE COURT:  But here we are.

2          MR. BYERLY:  Here we are, and to be clear, you know,

3    it's not --

4          THE COURT:  Wait just a minute.  So, again, the thing I

5    want you to take away more than anything else --

6          MR. BYERLY:  Uh-huh.

7          THE COURT:  -- is that the consequences of violating a

8    court order --

9          MR. BYERLY:  Very serious.

10         THE COURT:  -- of non-disclosure, they are very serious.

11         MR. BYERLY:  Yes.

12         THE COURT:  And money would be, really in a way, the

13   least concern to you.  There would be other consequences of

14   finding yourself in contempt of court.

15         MR. BYERLY:  Yes, ma'am.

16         THE COURT:  So I often encounter people who really

17   believe they are right on one point and they go horribly astray

18   by trying to break other laws, and anyway I appreciate your

19   time, and let me turn back then, as the movant, do you have

20   any --

21         MR. BYERLY:  May I make one last comment?

22         THE COURT:  You may.

23         MR. BYERLY:  Regarding the last e-mail that Rayonier

24   seems to think is the basis of any attempts of mine to -- my

25   only intentions in referencing SpaceX and NASA were to

1   illustrate, by referencing totally separate industries, what my

2   capability is so that they would hopefully listen to me and

3   listen because all I want is for Rayonier to say, "Here's what

4   we've done to mitigate this safety issue," because my fear --

5   someone will replace me.  They have to.  February is the next

6   shutdown.  I had seven years' experience and I almost died.

7   Someone will lose their life potentially, you know,

8   hypothetically, if nothing is done.  I can't morally stand here

9   and do nothing, but the avenue I have left to me, you know --

10          THE COURT:  Is not violating --

11          MR. BYERLY:  -- is not -- that's right, it's not

12   violating the -- I will never violate the non-disclosure

13   agreement.  I will thoroughly review with lawyers before I do

14   any action whatsoever that could in any way be perceived as

15   violating a non-disclosure agreement.  That is not my intention,

16   wholeheartedly.

17          THE COURT:  Once The Court issues an order, you would

18   need to come back to court to --

19          MR. BYERLY:  Sure.

20          THE COURT:  -- do anything; you understand that?

21          All right.  Thank you, Mr. Byerly.  I appreciate it.

22          And in brief rely, Mr. Durham?

23          MR. DURHAM:  Your Honor, I'll try to be brief.

24          First of all, the company has absolutely no issues with

25   any investigation into safety.  We deal with OSHA all the time.

1    That's not a problem.  Rayonier has done -- Ray-AM has done

2    their own initial investigation, done an investigation into all

3    of those situations.

4         Through their investigations they have not found the

5    safety concerns expressed.  But we're more than willing to meet

6    those, and that is a completely separate issue as to why we are

7    here.

8         Irrespective, as far as the trade secret information,

9    once again, I said earlier that the equipment, some of the

10   technology is not necessarily what we're talking about.

11        We're talking about the chemical bleaching process that

12   constitutes trade secrets that he does have in his head.

13   Irrespective of all of the various concerns he may have

14   expressed, the simple fact of the matter is that he did send

15   those e-mails that are quite threatening from the standpoint of

16   irreparable harm, reverse engineering and trade secret

17   information, which is something that Ray-AM very much protects

18   and needs to protect.

19        And I think I mentioned in the other matters early on

20   about the four factors, looking at, as far as what is important

21   in making the determination of whether an injunction is entered,

22   I sort of glossed over the disservice to the public part in the

23   last part of it, but I would say to The Court, too, that it's

24   extraordinarily important to the public to know that

25   confidential and trade secret and privileged information for

1  companies will, in fact, be protected, and it's also important

2  for an entire community in Wayne County and surrounding counties

3  being that it is the largest employer in that area and the

4  largest tax base in Wayne County.

5      The viability of the company is also important to a lot

6  of the public, so I would just emphasize that on that last

7  factor, it's an important factor not just to the viability of

8  Ray-AM, but to a lot of people that are involved and that are

9  employed, and trade secrets just simply cannot be disclosed and

10  that's what we're asking.  That's what we're here for.

11      THE COURT:  Gentlemen, I appreciate your arguments, and

12  I am ready to rule.  I will, of course, follow up with a written

13  order that will be sent to both of you, but after considering

14  the verified complaint and the attachments, the arguments made

15  by both parties and the submission presented by Mr. Byerly here

16  in court today, I do find that the requirements for issuing a

17  temporary restraining order under Rule 65 have been met, and to

18  be clear, quite clearly met.

19      In the Eleventh Circuit there are four standard

20  conditions that any plaintiff seeking such a restraining order

21  must show, first that a substantial likelihood of success on the

22  merits has been shown and that is clearly shown here.  There is

23  a non-disclosure agreement, and there are the various causes of

24  actions that are set forth in the verified complaint, the

25  elements of which are satisfied, based on the exhibits that have

1    been shown.  There's substantial likelihood of success on

2    showing that those elements are satisfied.  Second, the

3    plaintiff has shown that they will suffer irreparable harm

4    unless the temporary restraining order issues.  Mr. Byerly has

5    given his assurances in court today that he has no intention of

6    violating the non-disclosure agreement, and there is, however,

7    the e-mail that he sent perhaps as somewhat of a hollow threat,

8    but nevertheless if he were not restrained from doing that,

9    obviously the plaintiff would suffer irreparable harm.  That

10   phrase is actually reflected in Mr. Byerly's, the middle part of

11   the e-mail chain.

12          Third, I do find that the threatened harm to the

13   plaintiff far outweighs the harm to the defendant.  The harm to

14   the plaintiff would be the disclosure of the trade secrets that

15   have been developed over many years and form part of the

16   underlying viability of the company.  The harm to the defendant

17   is really not apparent.  He has already said he's not going to

18   do this anyway, and so ordering him to do what he doesn't intend

19   to do is not much of a harm.

20          Fourth, I do find that issuing the temporary restraining

21   order would actually be in the public interest.  Not just a lack

22   of aversion to the public interest, it would actually promote

23   the public interest because we do want individuals and companies

24   to have an incentive to develop trade secrets and protected

25   information and so that would promote that public interest.

1          As I said before, subject matter jurisdiction, personal

2     jurisdiction, venue have all been proven.  Therefore, The Court

3     finds that the temporary restraining order should issue, and

4     again I will provide both sides a written copy that will be

5     better stated in writing, but nevertheless the content of the

6     restraining order will restrain Mr. Byerly and enjoin him from

7     misappropriating any of plaintiffs' trade secrets.

8          Mr. Byerly, that means you simply can't share that

9     information with anybody; second, that you are ordered to return

10    to the plaintiffs any trade secrets in any form whatsoever that

11    you have retained within two days of today.

12         I understand you say that you don't have any.  And it is

13    important that you recheck and make sure because you are hereby

14    ordered to return any trade secrets to the plaintiff within two

15    days.  The temporary restraining order will remain in effect

16    until I consider the matter for the issuance of a preliminary

17    injunction and we can do that by phone if the parties agree, and

18    we will be in contact with you about that transition from a

19    temporary restraining order to a preliminary injunction.

20         As I said, I will issue a written order to that effect.

21    Mr. Byerly, remember, I do caution you it's more important than

22    you might think that you comply with that.

23         All right, we will be in recess.

24         (Proceeding concluded at 11:20 a.m.)

25

30

```
1                         CERTIFICATION

2

3         I certify that the foregoing is a true and correct

4   transcript of the stenographic record of the above-mentioned

5   matter.

6

7

9   _____        07/01/2021

10  Debra Gilbert, Court Reporter          Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```